David J. McGlothlin. Esq. (SBN165634)
david@kazlg.com
**KAZEROUNI LAW GROUP, APC**
301 E. Bethany Home Road, Suite C-195
Phoenix, AZ 85012
Telephone: 800-400-6808
Facsimile: 800-520-5523

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **DEBRA JOAN COATES GRIFFIN and ROBERT HESSEE,** individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> **AMERICAN-AMICABLE LIFE INS. CO. OF TEXAS,** <br><br> Defendant. | **Case No.:** 6:24-CV-0243-MC <br><br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

## I.    INTRODUCTION

Plaintiffs Debra Joann Coates Griffin ("Plaintiff Griffin") and Robert Hessee ("Plaintiff Hessee") (together referred to as "Plaintiffs") filed this putative class action complaint after Defendant American-Amicable Life Ins. Co. of Texas ("Defendant") or their agents engaged in illegal telemarketing solicitation against them. In every phone call, Defendant or Defendant's agents promoted Defendant's products despite: (1) Plaintiffs' registration on the National Do-Not-Call list and (2) Plaintiffs' repeated requests to cease

telephonic solicitation, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA").

Defendant asks this Court to dismiss under Federal Rules of Civil Procedure ("FRCP") 12(b)(6) and 12(b)(1). Defendant argues against: (1) Plaintiff's theory of Defendant liability; (2) Plaintiff's Caller ID allegations; and (3) Plaintiff's standing under Article III of the U.S. Constitution to seek injunctive relief.

Contrary to Defendant's arguments, Plaintiff properly alleged Defendant's liability, asserted grounds for violations of the FCC's Caller ID regulation, and has standing to seek injunctive relief. For these reasons, and others, explained more fully below, this Court should deny Defendant's Motion to Dismiss.

## II.    <u>STATEMENT OF FACTS</u>

### A. Plaintiff Robert Hessee

In May of 2022, Plaintiff Robert Hessee, a retiree, received numerous calls to his cellular phone despite his registration on the National Do Not Call Registry since June 14, 2008. First Amended Complaint ("FAC") ¶¶ 27-28.

On May 16, 2022, Defendant or Defendant's agent called Plaintiff Hessee from the number and introduced themselves as Sam with Funeral Expense. FAC ¶ 29. When Sam attempted to sell Plaintiff Hesse life insurance, Plaintiff Hesse expressed disinterest in Defendant's services and hung up. *Id*. The next day, Sam from Funeral Expense once again called Plaintiff Hesse; however, this time Sam "explicitly informed Plaintiff Hesse that they were calling on behalf of American Amicable." *Id*. at ¶ 30. Sam again attempted

to sell Plaintiff Hesse life insurance, and Plaintiff Hesse "told them he was not interested." *Id*.

On May 19, 2022, *for the third time*, Sam from Funeral Expense called Plaintiff Hesse and "explicitly said that they were calling on behalf of American Amicable to solicit the sale of life insurance." *Id*. at ¶ 31. Sam transferred the call to two individuals: Ronnie Evans and Robert Radcliffe. *Id*. Both Mr. Evans and Mr. Radcliffe advertised Defendant's life insurance products. *Id*. Notably, Mr. Radcliffe "is a licensed insurance producer with the National Association of Insurance Commissioners." *Id*. at ¶ 32. "The company name associated with his license" shows "American-Amicable Life Insurance Company of Texas." *Id*.

### B.  Plaintiff Debra Joann Coates Griffin

Plaintiff Griffin "registered her phone number on the National Do Not Call Registry on August 24, 2021." *Id*. at ¶ 35. "Between February and March of 2023 Defendant called Plaintiff Griffin…at least three times." *Id*. at ¶ 37.

On February 10, 2023, Defendant or Defendant's agent called Plaintiff Griffin. *Id*. at ¶ 38. The caller identified as Senior Final Expenses calling on behalf of American Amicable. *Id*. The caller tried to sell Plaintiff Griffin life insurance, but Plaintiff Griffin said she did not want to speak with them over the phone. *Id*. Disregarding Plaintiff Griffin, the caller transferred her to Benjamin Angels who "tried to sell her the same life insurance and explicitly stated they did so on behalf of American Amicable." *Id*. Plaintiff Griffin "expressed disinterested and hung up[.]" *Id*. When trying to call Mr. Angels back, a

prompt says, "the text mail subscriber is not working." *Id*. at ¶ 39.

On March 2, 2023, Defendant or Defendant's agent called Plaintiff Griffin. *Id*. at ¶ 40. The caller again identified themselves as Senior Final Expenses calling on behalf of American Amicable. *Id*. The caller tried to sell Plaintiff Griffin life insurance. *Id*. "Plaintiff Griffin reiterated her disinterest" and the caller transferred her to Sarah Angle who "also tried to sell Plaintiff Griffin life insurance, explicitly referencing that they did so on behalf of American Amicable." *Id*. "Plaintiff Griffin explained she did not want to speak over the phone." *Id*.

On March 7, 2023, Defendant or Defendant's agent called Plaintiff Griffin for the third time. *Id*. at ¶ 41. As like each time prior, the caller identified themselves as Senior Final Expenses calling on behalf of American Amicable. *Id*. Again, the caller tried to sell life insurance to Plaintiff Griffin, and again Plaintiff Griffin said she did not want to communicate over the phone. *Id*. Unfortunately, as with all the prior times, the caller transferred Plaintiff Griffin to a separate agent named Mark Simmons. *Id*. "Mr. Simmons also tried to sell Plaintiff Griffin life insurance, explicitly referencing that they were doing so on behalf of American Amicable." *Id*.

"Most, if not all, of Defendant's unsolicited telemarketing phone calls—including hose that when called back prompted that 'the text mail subscriber is not working'—did not display the requisite caller ID information in violation of 47 C.F.R. § 1601(e), as promulgated by 47 U.S.C. § 227(c)." *Id*. at ¶ 51.

III.    **LEGAL STANDARD**

    **A. Rule 12(b)(6)**

    Rule 12(b)(6) permits the dismissal of a case if the complaint "fail[s] to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion "is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Develop. Corp.*, 108 F.2d 246, 249 (9th Cir.1997). The Court accepts all complaint allegations as true, considers them as a whole, and draws all reasonable inferences in Plaintiff's favor. *Association for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). Plaintiffs are not required to plead "detailed factual allegations" to state their claims under Rule 8. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.") (citations and alteration omitted). Plaintiffs need only set forth enough facts to state claims that are facially plausible. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

    **B. Rule 12(b)(1)**

    Under FRCP Rule 12(b)(1), a court may dismiss an action for "lack of subject-

matter jurisdiction." "A Rule 12(b)(1) jurisdictional attack may be facial or factual. *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id*.

IV.    **ARGUMENT**

      A. **Plaintiffs Adequately State a Claim of Direct Liability Against Defendant, and Alternatively, States a Claim of Vicarious Liability Against Defendant's Agents.**

Despite all facts pointing to Defendant's involvement in the phone calls at issue, Defendant claims that Plaintiff has not plausibly pled that Defendant was responsible for them. "To 'make' a call under the TCPA," and thus become liable, "the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Ewing v. Encor Solar, LLC*, 2019 WL 277386, at *6 (S.D. Cal. Jan. 22, 2019) (citing *Gomez v. Campbell-Ewald, Co.*, 768 F.3d 871, 877-79 (9th Cir. 2014)). "The Ninth Circuit has emphasized that 'calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call.'" *Hewlett v. Consol. World Travel, Inc.*, 2016 U.S. Dist. LEXIS 112553, at *12 (E.D. Cal. Aug. 23, 2016) (citing *Gomez*, 768 F.3d at 878 (rejecting the argument that a defendant "cannot be held liable for TCPA violations because it outsourced the dialing and did not actually make any calls")).Plaintiffs have adequately pled both.[1]

---

[1] Agency is an incredibly fact intensive inquiry that is not suitable for full adjudication

### i. Direct Liability

Plaintiffs plausibly alleged direct liability as the complaint refers to three separate phone calls received by each Plaintiff Hessee and Plaintiff Griffin, all of which promote Defendant's products. Moreover, the initial callers and subsequent agents *repeatedly* established that they called on behalf of American Amicable.

"To establish direct liability, the complaint must allege facts showing the defendant actually placed calls violating the TCPA." *Wokeman v. CarGuard Admin. Inc.*, 2024 U.S. Dist. LEXIS 11476, at *5 (D. Ariz. Jan. 22, 2024).

If a caller associates with a specific company, it is plausible to believe that that company is directly liable for the calls. *Wokeman*, 2024 U.S. Dist. LEXIS 11476. In *Wokeman*, the plaintiff received a prerecorded message, followed the phone prompts, and got transferred to two individuals. *Id*. at *6. The final person that plaintiff spoke to emailed him a contract between Plaintiff and the Defendant. The Court relied on this interaction alongside allegations that "Defendant itself called Plaintiff[,]" to hold that the plaintiff "alleged sufficient facts that support a plausible inference that Defendant personally placed the calls at issue." *Id*. The defendant argued that the final person Plaintiff spoke to "may have been working for an authorized third-party seller, rather than Defendant specifically." *Id*. at *7. However, the court quickly shut down this line of argumentation as "not appropriate for the Court to consider at this stage of the proceedings." *Id. See also*

---

on a Motion to Dismiss. Accordingly, at this stage, the appropriate choice is for the Court to examine the well-pled Complaint and draw all reasonable inferences in Plaintiffs' favor in determining whether Plaintiffs have adequately stated a claim that could support finding any form of agency liability.

*Lemieux v. Lender Processing Ctr.*, 2017 U.S. Dist. LEXIS 47139 (S.D. Cal. Mar. 24, 2017) (finding that transferring plaintiff from a first caller—who identified with a different company—to defendant, is enough facts to allege defendant as "responsible for the telephone call that allegedly violated the TCPA.")

Here, for both Plaintiffs, nearly every speaker identified their affiliation with Defendant. In fact, at least *eight* individuals between Plaintiff Hesse and Plaintiff Griffin explicitly told Plaintiffs that they were calling on behalf of Defendant. Plaintiff Griffin received three calls from individuals identifying as either Defendant or an agent of Defendant. FAC ¶¶ 38, 40-41. Furthermore, each subsequent transferred call resulted in another individual telling Plaintiff Griffin that they called on behalf of Defendant. *Id*. As for Plaintiff Hesse, he received three phone calls from the same individual named Sam with Funeral Expense; however, on the latter two of these calls Sam indicated his affiliation with Defendant. *Id*. at ¶¶ 29-31. Like in *Wokeman*, Defendant spoke to an individual directly affiliated with the violating party. As such, these are not merely "conclusory allegations"—no, Defendant either directly or through agents verbally confirmed its complicity in these unlawful solicitations. Indeed, Plaintiff Griffin even confirmed that at least one telemarketer, Robert Radcliffe, is designated as a licensed insurance producer and lists Defendant as his employer. *Id*. at ¶ 32. Moreover, every individual that Plaintiffs spoke to attempted to solicit life insurance—the very product that Defendant sells. *Id*. at ¶¶ 29-31, 38, 40-42.

Because the calls all directly promoted Defendant's products and the last call

specifically provided a call-back number to Defendant, Plaintiffs have adequately pled that Defendant directly made the calls at issue.

### ii.  Vicarious Liability

Plaintiffs additionally plead that, in the alternative, the calls were placed by an agent of Defendant with either formal agency, apparent authority, or ratification. The Parties agree that in addition to direct liability, a Defendant "may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer." *In the Matter of The Joint Petition Filed by Dish Network, LLC, et al.*, CG Docket No. 11-50 (FCC 13-54), 28 FCC Rcd 6574, 6582 ¶ 24 (2013) ("2013 FCC Order") at ¶ 24. The Ninth Circuit made clear that courts should look to the Restatement (Third) of Agency for common law agency principles. *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072–73 (9th Cir. 2019) (citing *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017)). Accordingly:

> "Agency is the fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. There are several ways to establish an agency relationship, including actual authority and ratification. Whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship . . . Restatement § 4.06 requires that a principal knows of the material facts involved in the act it is ratifying. This knowledge requirement is met if the principal either has 'actual knowledge' or 'choose[s] to affirm without knowing the material facts.' Comment d adds that 'a factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation.' This can also be described as 'willful ignorance.'"

*Id.* at 1072-74 (internal citations omitted)

The question of "[w]hether an agency relationship exists is ordinarily a question of fact." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014). "Although the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a *reasonable inference* that an agency relationship existed." *Id.* (emphasis added). The question should be approached "with a measure of common sense…where the implication is clear from the context." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

### a. Actual Authority

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act." Restatement 3rd of Agency § 2.01. The direct representations of an agent provide strong evidence for actual authority. *Goodell v. BH Auto., LLC*, 2023 U.S. Dist. LEXIS 54131, at *13-14 (D. Ariz. Mar. 29, 2023) (finding against actual authority when "most importantly, the offending calls here were not made by third-party telemarketers on [defendant's] behalf…").

Here, Plaintiff Griffin received three calls, all of which provided the same call back number and promoted Defendant and Defendant's product. FAC ¶¶ 38, 40-41. Although each caller initially represented themselves as Senior Final Expenses, each also specifically stated that they called on behalf of Defendant American Amicable to solicit Defendant's

services. *Id.* Similarly, Plaintiff Hessee received three calls from "Sam from Funeral Expense," who promoted Defendant and Defendant's product. *Id.* at ¶¶ 29-31. On the latter two phone calls, Sam explicitly stated he called on behalf of Defendant. *Id.* at ¶¶ 30-31. Furthermore, during Plaintiff Hessee's third call, Sam transferred him to two different agents. *Id.* at ¶ 31. While both agents attempted to sell Plaintiff Hesse the same life insurance as before, one agent lists Defendant on his license with the National Association of Insurance Commissioners. *Id.* at ¶ 32.

Notwithstanding the reasonable inference of agency described from the facts in the preceding paragraphs, Defendant proffers the idea that the "FAC contains no allegations that American-Amicable exercised any control over any third party that allegedly made the calls" ECF No. 14, pp. 22-23. Surely Defendant recognizes that individuals do not simply promote "American Amicable" as a hobby. Of course not. These same individuals then transferred calls to agents who also purport to be directly associated with Defendant. The only reasonable inference from this sequence of events is an agency relationship. FAC ¶ 65. Indeed, through any "measure of common sense" actual authority "is clear from the context." *Chesbro*, 705 F.3d at 918. Interestingly, the initial callers—notwithstanding the fact they specifically said they were calling on behalf of Defendant—each used "company" names associated with funeral-related insurance preparedness ("Funeral Expense" and "Senior Final Expenses" respectively). The choice of these similarly titled, generic names implies a coordinated telemarketing campaign. Combined with (1) Plaintiffs' inability to determine the existence of these "companies" through due diligence, and (2) the nearly

identical method of vetting and transfer (one might even say scripted) that the callers performed, displays textbook third-party telemarketing. Plaintiff does not rely on "legal buzzwords," as Defendant alleges, Plaintiff need only rely on the words of Defendant itself and its myriad callers who explicitly identified themselves as calling on behalf of American Amicable.

Between the promotions of Defendant's products and Defendant's call-back number, Plaintiffs adequately pled actual authority at this stage of the proceedings. *See Armstrong v. Investor's Bus. Daily, Inc.*, 2019 U.S. Dist. LEXIS 150169 (C.D. Cal. Mar. 12, 2019) (finding defendant's reliance on *Jones v. Royal Admin. Servs.*, 887 F.3d 443, 453 (9th Cir. 2018) to be misplaced at the 12(b)(6) stage because actual authority 'is a multiple prong fact-intensive inquiry more suitable for summary judgment[.]") Because Plaintiffs provided facts indicating the relationship between Defendant and Defendant's alleged agent, Plaintiff has properly plead actual authority.

### b. Apparent Authority

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement 3rd of Agency § 2.03. "If a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of

undisclosed limits on the agent's authority. *Id*. Apparent authority is "established by proof of something said or done by the [principal], on which [plaintiff] reasonably relied." *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997).

In 2013, the FCC issued an order and listed factors that can indicate apparent authority, of which one is immediately apparent here: "the authority to use the seller's trade name, trademark and service mark" *In the Matter of The Joint Petition Filed by Dish Network, LLC et al.*, FCC 13-54, CG Docket No. 11-50 ¶ 46.  The FCC went on to observe that "at a minimum, evidence of these kinds of relationships – **which consumers may acquire through discovery, if they are not independently privy to such information** – should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent…. nothing in our ruling requires a consumer to prove at the time of their complaint (rather than reasonably allege) that a call was made on the seller's behalf."  *Id.* at ¶ 46 and Fn. 139; *See also Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969) ("In determining whether there was apparent authority, the factual inquiry is the same as in the case of actual implied authority, except that the principal's manifestations to the third person are substituted in place of those to the agent…[and] may consist of direct statements to the third person"); *Rahimian v. Adriano*, 2022 U.S. Dist. LEXIS 46437, at *13 (D. Nev. Mar. 16, 2022) (finding against apparent authority because the agent *only* identified themselves as a different entity, not referring to Defendant); *Tuso v. Nat'l Health Agents, LLC*, 2021 U.S. Dist. LEXIS 115467, at *8

(E.D. Cal. June 21, 2021) (dismissing apparent authority based on "the complete lack of contact between Plaintiff and [Defendants]"); *Kristensen*, 12 F. Supp. 3d at 1302 (Plaintiff "need not plead the identity of every player in the alleged scheme nor every nuance of the relationships among the Defendants; indeed, the information necessary to connect all the players is likely in Defendants' sole possession"); *Ewing v. Freedom Forever LLC*, 2021 U.S. Dist. LEXIS 53561, at *10 (S.D. Cal. Mar. 22, 2021) (Apparent authority properly alleged when the lead source asked specific questions (including scripts to be read) at their behest; "Courts within this Circuit have found similar, and even less detailed, allegations adequate to state a claim for vicarious liability and to survive a motion to dismiss"). *Goodell*, 2023 U.S. Dist. LEXIS 54131 at *18-19 (finding no apparent authority when there is no evidence the "unlawful calls took place under [defendant's] watch or on its behalf, nor evidence of any other 'red flags' that should have alerted [defendant] to investigate potential violations of the TCPA").

Here, Plaintiffs have alleged that the Defendant's agent placed three calls to both Plaintiff Hessee and Plaintiff Griffin respectively and subsequently promoted Defendant's products. Plaintiffs here have clearly pled that the representatives on the calls were holding themselves out as representatives of Defendant. So much so, in fact, that Plaintiffs believed the agents may have been the Defendant itself. Nearly every single caller identified themselves as calling on behalf of Defendant. FAC ¶¶ 29-31, 38, 40-41. Furthermore, these callers all began the conversations in much the same manner using a "final expense" or "funeral" related pitch and probing questions. Moreover, Defendant

provided Plaintiff Griffin with an identical call back number from each representative, and Plaintiff Hesse eventually spoke to an individual whose license identifies Defendant by name.

It is similarly obvious that some agreement existed between Defendant and its agents regarding the placing of calls, the promotion of Defendant's products, and the transfers of these calls to Defendant. During each call to Plaintiff Griffin, agents indicated they called on behalf of "American Amicable" and referred specifically to Defendant's products. *Id*. Thus, Defendant had knowledge of the calls being placed, or at the very least, facilitated a telemarketing campaign using these agents. Clearly, a reasonable consumer— having heard the same trade name, with the same products, and eventually receiving a direct transfer and similar call-back numbers—would believe that apparent authority existed by the initial callers to bind Defendant to these telemarketing calls.  Accordingly, Plaintiffs adequately alleged that Defendant's agents were acting with apparent authority adequate to create vicarious liability.

### c.  Ratification

A principal may ratify the conduct of an agent.  "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement 3rd of Agency § 4.01. A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person consents. *Id*. at § 4.01. "[K]nowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction.

This is so even though the person also manifests dissent to becoming bound by the act's legal consequences." *Id*., Comment d., ¶ 2.

Defendant ratified its agent's actions through accepting the benefits of their telemarketing services. Plaintiff Hessee's allegation of the third call's transfer to Defendant exemplifies the actions of a company which knowingly benefits from another. FAC ¶ 31. If an individual marketer continuously transfers calls to a company after having vetted potential consumers, at a certain point—if even no actual authority existed—a company is bound to investigate. The interactions between Plaintiffs and the callers presents a significant nexus between the callers and Defendant. And even if Defendant claims to not know of these callers, "willful ignorance" does not extinguish liability from the benefits received. Defendant clearly accepted the benefit of its agents' actions in the form of telemarketing promotions and transfers to which it attempted to solicit its services. The acceptance of benefits and continued acceptance of benefits despite knowing what its telemarketing agents "were doing or, at the very least, knowing of facts that would have led a reasonable person to investigate" creates agency. *Henderson*, 918 F.3d at 1072–73 (citing Restatement of Agency § 4.01 cmt. g). Thus, Defendant also ratified the calls at issue and may be held vicariously liable for the actions of its agent.

**B.  Plaintiffs Properly Pled Violations of 47 C.F.R. § 64.1601(e)**

Plaintiffs have properly alleged violations of the TCPA's caller ID restrictions based on the FCC's regulation having been promulgated by 47 U.S.C. § 227(c). As such, the regulation does not conflate distinct claims; instead, it legitimately pursues both theories

of liability under the same statutory authority. Additionally, this theory provides a private right of action as detailed by the reasoning and purpose of the FCC's adoption of the National Do-Not-Call rule. Finally, the FAC provides sufficient facts to demonstrate the violation.

Under 47 C.F.R. § 64.1601(e), "[a]ny person or entity that engages in telemarketing…must transmit caller identification information." The FCC adopted this regulation in 2003 as part of the FCC's national do-not-call rule. Federal Commc'ns Comm'n, *Final Rule*, 68 Fed. Reg. 44,144, 44,179 (July 25, 2003). The FCC specifically wrote that these "new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibit them from blocking such information." *Id*. at 44,144 ¶ 1. The regulation notes:

> "[C]aller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. ***The telephone number so provided must permit any individual to make a do-not-call request during regular business hours***…Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information."

47 C.F.R. § 64.1601(e)(1), (2) (emphasis added).

In its adoption of these restrictions, the FCC noted that "[c]aller ID requirements will improve the ability of ***consumers*** to identify and ***enforce*** do-not-call rights against telemarketers." 68 Fed. Reg. at 44,156 ¶ 65 (emphasis added). Indeed, the FCC adopted these rules "to provide ***consumers*** with several options for avoiding unwanted telephone

solicitations." 18 F.C.C. Rcd. 14014, 14017 ¶ 1 (emphasis added). The FCC noted that:

> "Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and 'dead air' calls."

68 Fed. Reg. at 44,166 ¶ 124.

In *Worsham v. LifeStation, Inc.*, the Court extensively explained, why C.F.R. §

64.1601(e) has a private right of action through 47 U.S.C. § 227(c):

> "Section 227(c) authorizes the FCC to promulgate rules to protect telephone consumers' privacy rights and create rules that will allow consumers to 'avoid receiving telephone solicitations to which they object…' Caller ID allows a consumer to 'make a do-not-call request during regular business hours,' further protecting the subscriber's privacy right by preventing future calls. Although the FCC's consideration of what network information must be transmitted via Caller ID is technical, we think it falls within the scope of the technologies that § 227(c)(1)(A) directed the FCC to consider in protecting the privacy rights of consumers. *See* 68 Fed. Reg. at 44,166-67 (evaluating the cost efficiency and availability of different network technologies for network transmission).

> Although the question is not free from doubt and the lines between regulations authorized by § 227(c) and (d) (or, perhaps, some combination of both) could be far clearer, for two reasons, we conclude that § 64.1601(e)(1) was promulgated pursuant to § 227(c) and, therefore, that a private right of action exists to enforce its provisions. First, to the extent the express terms of § 64.1601(e)(1) apply to live telemarketing calls, they would exceed the scope of regulation authorized by § 227(d), but not the scope of § 227(c). Second, by requiring the provision of information expressly for the purpose of allowing individuals 'to make a do-not-call request,' the regulation serves the purpose of § 227(c) of 'protect[ing] subscribers from unrestricted commercial telemarketing calls.'"

*Worsham v. LifeStation, Inc.*, 2021 Md. App. LEXIS 1014 at *46-48 (App. Nov. 17, 2021).

Here, Plaintiffs properly pled violations of 47 C.F.R. § 64.1601(e) under 47 U.S.C. § 227(c). As detailed above, it is Plaintiff's position that the caller ID regulations are promulgated through § 227(c)'s private right of action. Defendant's allegation of conflating distinct claims is also incongruous with other regulatory provisions promulgated by § 227(c). For instance, if a person revokes consent from a caller they may plead both standard do-not-call allegations and internal revocation theories of liability under the same cause of action. Such is also true of the caller ID restrictions. While Defendant alleges that "[t]hese claims have nothing in common," it ignores that the purpose of the caller ID restrictions is to facilitate and assist consumers in enforcing their do-not-call rights. The caller ID regulations provide a regulatory scaffolding to allow for the proper enforcement of these rights, much in the same way as internal revocation of consent.

Along these same lines, 47 C.F.R. § 64.1601(e) provides a private right of action. Plaintiff believes this Court should follow the sound reasoning of the *Worsham* court and the purpose and reasoning detailed throughout the FCC's 2003 rule implementing the National do-not-call rule. Although other courts have held the Caller ID requirements as promulgated through § 227(d), this line of reasoning is flawed. When the FCC promulgated § 64.1601(e) in 2003, it cited section 227(d) only twice; both references were in a paragraph dealing with caller ID requirements for junk faxes. 68 Fed. Reg. at 44,170 ¶ 146 (July 25, 2003). Conversely, the FCC cited § 227(c) ***thirty-six times.*** Furthermore, § 64.1601(e) requires caller ID for all telemarketing calls, regardless of whether they are

live calls hand-dialed by a telemarketer or are calls that include a prerecorded or artificial voice. As § 227(d) only relates to procedural standards for faxes and requirements for prerecorded call transmissions (regardless of whether they include telemarketing messages), § 227(d) could not have promulgated the Caller ID regulations for telemarketers under the FCC. Accordingly, § 64.1601(e) contains a private right of action through § 227(c) of the TCPA.

Finally, Plaintiff properly pled factual allegations that Defendant failed to adhere to 47 C.F.R. § 64.1601(e). Plaintiff correctly explained that "[m]ost, if not all, of Defendant's unsolicited telemarketing phone calls—including those that when called back prompted that 'the text mail subscriber is not working'—did not display the requisite caller ID information in violation of 47 C.F.R. § 1601(e), as promulgated by 47 U.S.C. § 227(c)." FAC ¶ 51. Indeed, each "autodialed" number by Plaintiff Griffin, which purportedly came from the same "Senior Final Expenses" calling on behalf of Defendant, had different phone numbers. Plaintiff Griffin, unable to call these numbers back, required the transferring agent to provide a call-back number. Unfortunately, these same call-back numbers then came back as "not working." *Id.* at ¶¶ 38-41. As the purpose of the Caller ID regulations is, in large part, to provide Plaintiffs with the tools to firmly invoke internal do-not-call policies, Plaintiffs here did not have that opportunity. Accordingly, Defendant violated the Caller ID restrictions pursuant to 64 C.F.R. § 1601(e).

### C. Plaintiffs Have Article III Standing to Assert Injunctive Relief

Plaintiffs have Article III standing to assert injunctive relief as the callers provided

no guarantee that the calls would cease and continued to call Plaintiffs despite Plaintiffs repeatedly requesting communications to cease.

Defendant claims that Plaintiffs have not satisfied the elements of Article III for injunctive relief because there is no imminent risk of future harm to the Plaintiffs. Defendants' argument hedges on the belief that simply because the last call received was in March 2023 that no future harm could occur. ECF No. 14, p. 32. This is not true. Plaintiffs' complaint demonstrated a pattern of unlawful behavior and Defendant has not provided any reassurances that it will cease. Given Defendant's penchant for calling Plaintiffs despite repeatedly asking them not to, Plaintiffs are at risk for future telemarketing at any time.

Accordingly, for the same reasons Plaintiffs adequately states a claim, Plaintiffs adequately supported that this Court has specific jurisdiction over Defendant who targeted this forum through its telemarketing campaigns.

### D. Request for Leave to Amend

Should this Court feel that Plaintiffs' complaint is inadequate at this time, Plaintiff requests leave to amend the complaint. Plaintiffs' first amended complaint attempted to rectify perceived flaws pursuant to Defendant's original motion to dismiss. As new arguments have been made, Plaintiff would ask for leave to amend to rectify any perceived flaws that this Court may find.

"A complaint should not be dismissed without leave to amend unless amendment would be futile." *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1086 (9th

Cir. 2014) (citation omitted). Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), a "party may amend its pleading once as a matter of course…if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Under Rule 15(a) "there exists a *presumption*…in favor of granting leave to Amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Here, Plaintiffs have pled in good faith and plausibly alleged the unlawful actions of Defendant. However, should this Court decide to grant Defendant's motion, Plaintiffs request leave to amend the complaint.

## V.   <u>CONCLUSION</u>

Based on the arguments set forth herein, Plaintiffs respectfully ask this Court to deny Defendant's Motion in its entirety. Should, however, the Court grant Defendant's Motion, in whole or in part, Plaintiffs respectfully request leave to amend the Complaint of any perceived deficiencies consistent with the policy of favoring amendment that is to be applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

Dated**:** June 20, 2024                    **Kazerouni Law Group, APC**

                                   By:    <u>/s/ David J. McGlothlin</u>
                                          David J. McGlothlin, Esq.
                                          Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 5,753 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated**:** June 20, 2024                    **Kazerouni Law Group, APC**

                                         By:    /s/ David J. McGlothlin
                                              David J. McGlothlin, Esq.